### In re GRIFFIN MFG. CO.

### Claim of COMMERCIAL FACTORS CORPORATION.

### No. 14667.

District Court, N. D. Georgia, Atlanta Division. Sept. 18, 1930.

Cleveland & Goodrich, of Griffin, Ga., for bankrupt.

Little, Powell, Reid & Goldstein, of Atlanta, Ga., and Chandler Bennitt, of New York City, for claimant.

D. R. Cumming, of Griffin, Ga., for trustee.

SIBLEY, District Judge.

The referee denied in toto the claim of Commercial Factors Corporation against the estate in bankruptcy of Griffin Manufacturing Company. His decision is for review. A motion was made to refer the matter back to him because he has not specifically ruled on each objection to pleadings and evidence, but this motion was waived with the understanding that the court would examine all such objections and make necessary rulings. The claim is for breach of a written contract making the Commercial Factors Corporation sole selling agent of the products of the Griffin Manufacturing Company, for three years ending June 11, 1930, by reason of the involuntary bankruptcy consented to by the latter, on July 8, 1929. Damages of $90,000 are claimed for loss of commissions, and of $130,000 for the par value of stock in the bankrupt company owned by the claimant and its associates alleged to be payable under a clause of the agency contract. The important facts recited in the written contract or established by other evidence are these: Previous to June 11, 1927, the claimant had acted as selling agent for the bankrupt under an arrangement terminable at will, on reasonable notice, selling the products of the bankrupt's cotton mills at 5 per cent. commission and agreeing to discount the sales and to lend additional money to the extent of $200,000 on the indorsement of certain officers, pro-

vided the liquid assets of the mill equaled its current liabilities, and having purchased or advanced money for 952 shares of common stock in the company. There arose factional differences among the stockholders, and in June, 1927, a majority of the common stock, which was thought to carry corporate control, was optioned to an outsider. It was expected the purchaser would displace the present officers and sales agent, and, in order to block the transfer, on June 11, 1927, the officers made with the claimant the written contract of June 11, 1927. This recited the arrangements above cited, and bound each party to continue them for three years. The final stipulation, so far as material, was: "It is further contracted and agreed that this contract may be terminated by either party by giving the other party six months written notice, and fully carrying out the sales agreement already entered into at the date of said notice, provided that the party of the first part shall not be permitted to cancel this contract unless and until the party of the second part has been fully paid off all money advanced and is given a bona fide offer to sell and dispose of the stock which it holds in the Griffin Manufacturing Co., either as owner or collateral, at the par value thereof." The contract became generally known to the stockholders and no steps were taken to set it aside. In the spring of 1929, an audit disclosed that the mill's liquid assets did not equal its current liabilities. $150,000 was due to banks beside the $200,000 owing the claimant. The banks wished to collect their loans, but claimant induced them to wait until June. In June the banks and claimant all sued the bankrupt in a court where judgment can be obtained in a few weeks. The claimant's officers admit that they knew these suits would result in closing down the mill. An involuntary bankruptcy did result on July 8th, unopposed by the bankrupt and encouraged by its officers. A receiver was appointed, who was authorized to continue the business, and who employed the claimant as sole sales agent, without prejudice to previous rights on either side, and the claimant acted as such until after June 11, 1930, the date for the termination of the former contract. •The claimant thus closed out all goods on hand and made prior to the cessation of manufacture in November, 1929, when the mills were sold. The estate was sufficient to pay all proved debts, with interest, leaving about $190,000 to go to preferred stockholders. On December 10, 1929, just prior to the final dividend, the present claim for $220,000 was filed.

■The objection to the item of $130,000 therein, the par of common stock held by claimant and its associates, that upon its face it was not owing, should have been sustained. It need not be decided whether a promise to present a purchaser for the stock was ultra vires or contrary to public policy. There was no such promise in the exhibited contract. The contract gave the Griffin Manufacturing Company the option to discontinue it on six months' written notice, provided it had fully paid the Commercial Factors Corporation all that was due it and procured a bona fide offer for the stock at par. This option was not sought to be exercised. No written notice was given. The debts were not paid nor the stock offer procured. Had these things been done, the contract would have been discharged, but by performance. There could have been no claim for future commissions. When they were not done, the contract remained of force and Commercial Factors Corporation had the right to insist on continuing to be sales agent, and to complain of any breach of it. It could ask compensation for a wrongful loss of commissions arising from its not being suffered to continue as agent until June 11, 1930, but it could not hold the Griffin Manufacturing Company for the value of its stock. Had the contract not been breached at its expiration, it would have had to keep the stock or sell it itself. The only damages resulting from the breach of the contract of employment would lie in the things that would have been received through its performance. The item touching the value of the stock should be stricken as on demurrer. All evidence touching it, of course, becomes irrelevant and to be excluded.

■ As to the item of loss of commissions, the objection made for vagueness has not been argued and is passed by, though originally meritorious. No objection was made to the original validity of the contract because of fraud. Besides, the contract was acquiesced in with full knowledge and acted on for two years. That a justified bankruptcy, whether voluntary or involuntary, is an anticipatory breach of a contract, so far as it is executory, by disabling the promisor to perform and by putting the business into other hands, must be considered settled by Central Trust Company of Illinois v. Chicago Auditorium Association, 240 U. S. 581, 36 S. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580, unless the present contract be one of the exceptions referred to in that opinion, or unless it really did not bind the Griffin Manufacturing Company to stay in business, or

unless the breach was cured by the bankruptcy court adopting and carrying out the contract. As to the last, the receiver and trustee did not adopt the old contract, but made a new one. The breach, therefore, was not cured. But inasmuch as the claimant thereby got much of the business which it is complaining of having lost, this fact is provable in mitigation of damages. The contract is not one touching real estate and one for that reason an exception to the rule. Neither is it one for purely personal services. The claimant is a corporation and must act through agents. It may handle as many selling accounts as it can get business to do and agents to do it. Much capital as well as time is stipulated for in this contract. It is not like the case of a hired officer or employee who has sometimes been held to have no claim for premature discharge which he can prove in bankruptcy. The claimant had an existing contract, which it was able, willing, and offering to perform on its part and which it was prevented from receiving the fruits of by the bankruptcy of the promisor, which bankruptcy was either justly caused by the acts of the bankrupt or induced and acquiesced in, and adopted, by the bankrupt. A claim for damages existed at the time of the filing of the bankruptcy petition and can be liquidated and proven in bankruptcy, according to the case of Central Company v. Chicago Auditorium, supra.

■ Whether the contract really bound the Griffin Manufacturing Company to stay in business until June 11, 1930, is a more difficult question. There is no express agreement to that effect. The contract as written may mean only that the Commercial Factors Corporation shall have the right to sell all the goods that the Griffin Manufacturing Company may sell, and not that the latter will continue to produce goods for the former to sell. The construction must depend on the things that are agreed on, on the evident purpose sought to be attained, and the circumstances of the parties. Cases cited by both sides recognize this to be the rule. Hollweg v. Schaefer Brokerage Co. (C. C. A.) 197 F. 689; Great Lakes Co. v. Scranton Coal Co. (C. C. A.) 239 F. 603; Lowery Lock Co. v. Wright, 154 Ga. 867, 115 S. E. 801. A cotton mill is ordinarily run continuously if it can get financial backing to carry its product over dull times. Such backing was arranged for in this contract. It is too much to say that these parties intended the mill to run continuously under all conditions on pain of paying commissions if it did not. Shortage of material, or fuel, or labor, inability to sell goods at all or at a profit, might have justified temporary cessation. But an unopposed bankruptcy, although solvent, that leads to a sale of the mill and permanent cessation of business seems to me equal to a voluntary cessation because of mere financial stress. This ought not to relieve completely from a valid mutual engagement such as this.

■■ The fact that the claimant joined in the withdrawal of credit and in suits which caused the financial embarrassment is impressive. Claimant knew when it sued that in all likelihood cessation of mill operation would follow. Yet the liquid assets of the mill having fallen below the current liabilities, the claimant was under no obligation to lend the $200,000, and could use lawful means to collect it. I do not think it thereby lost all right to complain of a breach of the contract of employment arising from the bankruptcy. But it did greatly affect the damages which could be recovered. The contract contemplated that this failure of liquid assets might occur, and that claimant might then withdraw its financial aid, and common knowledge taught both parties that such a situation would prevent the mill making many goods, because running capital is as necessary as material, labor, and machinery. Nevertheless the parties did not stipulate for a definite output, or that commissions should be maintained notwithstanding production decrease. Nor was there an agreement that capital must be procured elsewhere. The fair conclusion is that the parties understood that the modified situation should have its natural effect both upon the mill and the selling agent. No doubt the mill was bound to exercise itself in good faith to run so far as it was able and to get such capital as it reasonably could, but there is nothing in the contract to make it owe commissions on goods which it could not produce and did not sell. If claimant had furnished part of the machinery instead of part of the capital, with a right to withdraw it on the same conditions, could it complain of the loss of commissions that resulted by its curtailment of the machines in operation? I think such diminution of product as naturally and necessarily would result from a diminution of working capital due to the act of the claimant itself would be provable in mitigation of expected commissions.

■ The parties here had had experience in what business could be done in good times and with the mill unembarrassed for money. Had these circumstances continued there

would have been a fairly certain basis for estimating lost commissions. It is, however, common knowledge that since the stock market crash, in November, 1929, the sale of textile products has been greatly curtailed and many mills forced out of operation. It is hard to say how far this would affect the Griffin Manufacturing Company had it continued to have money to operate. Also an element of doubt is added by the holding above made that the mill may avail itself of a limitation of operation resulting directly from the withdrawal of the $200,000 credit by the claimant. It may be that the claimant has already, through the business done for the receiver and trustee, made as much as it would have, had the bankruptcy not happened. In liquidating an anticipatory breach of contract, the occurrences up to the time of trial may be proven and considered that throw light upon the damage really suffered. Roberts v. Crowley, 81 Ga. 429, 7 S. E. 740; Roberts v. Rigden, 81 Ga. 440, 7 S. E. 742.

My conclusion is that the claimant has a cause of claim in the item for loss of commissions, but that there are substantial factors of mitigation, discussed above, which have not been very directly examined and that a rereference is desirable to fix what, if any, damages are allowable in view of them. Direction is given that all the evidence be withdrawn and that each side reoffer such portions of it as it deems pertinent, with the right to supplement it as desired, the referee ruling on objections and making a new finding as to the allowable damages in accordance with this opinion.