## In re OWL DRUG CO.
No. 480.

District Court, D. Nevada.
Oct. 1, 1935.

Jesse H. Steinhart, of San Francisco, Cal., for claimant.

Thatcher & Woodburn, of Reno, Nev., for trustee, George K. Edler.

YANKWICH, District Judge.

By an instrument denominated "Agreement of Lease" made on February 15, 1932, the claimant, B. F. Schlesinger & Sons, Inc., a corporation, leased to the bankrupt a certain space for conducting a toilet goods department. The space was a portion of the first floor of the B. F. Schlesinger & Sons, Inc., store in Oakland, having an area of approximately 900 square feet and being the same as the space then occupied by the toilet goods department, evidently conducted either by the B. F. Schlesinger & Sons, Inc., or by others. The term of the lease was three years commencing February 15, 1932, and ending on February 15, 1935. The bankrupt agreed to pay, *as rent for the premises,* 15 per cent. of the gross cash sales and 15 per cent. of the gross credit sales made upon the premises; the rental being payable on the 10th of each and every month for the preceding month. The lessee also guaranteed a minimum rental of 15 per cent. on $134,000, that being the business done for the year 1931. By a writing denominated "Supplement Lease" and embodied at the end of the same instrument, the claimant leased a cut-rate drug department, then being run by them, of an area of 300 square feet, for which the bankrupt agreed to pay to the lessor 5 per cent. of all net sales, *as rent.* On the date of the adjudication in bankruptcy, October 10, 1932, the bankrupt was indebted to the claimant in the sum of $3,299.36, which sum has been allowed as a general claim against the estate. Subsequent to the adjudication, the trustee carried on the business until February 13, 1933, when he disaffirmed the lease, paying the claimant 15 per cent. of all sales made under his authority prior to that time. A claim for a deficiency of $1,862.52 between the sales made by the trustee and the minimum guaranty of the lease was allowed as an expense of operation by the trustee. Subsequent to February 13, 1933, the trustee occupied the premises under an agreement to pay as rent 12½ per cent. of the sales, without a minimum guaranty. Under this agreement, the claimant received as rent for the period between February 15, 1933, and February 15, 1934, a sum which was $8,329.33 less than it would have received under the original agreement. The claimant claimed this amount and a similar amount for the unexpired portion of the term, or a total of $16,658.66, as damages for breach of its agreement. The disallowance of this amount by the referee is now before us for review.

Its determination depends upon the application to the facts in the case of one of two principles. The first is that, under the decisions in Manhattan Properties v. Irving Trust Co. (1934) 291 U. S. 320, 54 S. Ct. 385, 78 L. Ed. 824, and Quinn v. Jaloff (C. C. A. 9th Cir., 1934) 71 F.(2d) 707, claims of a landlord for damages by reason of the anticipatory breach of a lease caused by the bankruptcy are not provable. This principle, of course, is subject to the exception which gives effect to clauses in leases which provide for liquidation of damages in cases of breach through bankruptcy or otherwise. Wm. Filene's Sons Co. v. Weed (1918) 245 U. S. 597, 38 S. Ct. 211, 62 L. Ed. 497. The manner in which these principles have been applied is discussed fully in the opinion just filed by the writer in Re Owl Drug Co. (Matter of the Claim of Altill Co.) (D. C.) 12 F. Supp. 431.

The ground upon which these decisions are based is that rent issues from the land, is not due until the rent day, and is due in respect of the enjoyment of the premises let, as Mr. Justice Holmes put it in Wm. Filene's Sons Co. v. Weed, supra, and that the act of bankruptcy leaves the lessor with a choice which neither the bankrupt nor the trustee has—the choice of terminating the lease. The decisions take into account certain historical considerations incident to the relationship of landlord and tenant. And it is evident that they leave unimpaired the other principle which is brought into play here, and under which provable claims in bankruptcy may arise from contingent claims arising from relationships other than that of landlord and tenant. In re Paramount Publix Corporation (Chase National Bank of New York v. Hilles) (C. C. A. 2d Cir., 1934) 72 F.(2d) 219; In re F. & W. Grand 5-10-25 Cent Stores, Inc. (Urban Properties Co. v. Irving Trust Co.) (C. C. A. 2d Cir., 1935) 74 F.(2d) 654.

This principle is grounded upon the proposition that where a person, through bankruptcy or otherwise, has disabled himself so as to make performance impossible, such act is an anticipatory breach which gives rise immediately to a right of action in the other contracting party. Roehm v. Horst (1900) 178 U. S. 1, 20 S. Ct. 780, 44 L. Ed. 953; Central Trust Co. v. Chicago Auditorium Ass'n (1916) 240 U. S. 581, 36 S. Ct. 412, 60 L. Ed. 811; In re Beverlyridge Co. (Oswald v. Beyer)

(C. C. A. 9th Cir., 1929) 35 F.(2d) 818; Federal Law of Contracts, vol. 2, § 446, pp. 217 et seq.; Gilbert's Collier on Bankruptcy (3d Ed., 1934) §§ 1268, 1269, pp. 987–989.

The doctrine of anticipatory breach declared in these cases has been applied to a great variety of circumstances.

Thus it has been applied to a promise to purchase and pay for stock of a corporation, In re Neff (C. C. A. 6th Cir., 1907) 157 F. 57, 28 L. R. A. (N. S.) 349; to a claim arising from a promise to pay a commission upon a sale of personal property, Heyward v. Goldsmith (C. C. A. 3d Cir., 1921) 269 F. 946; to profit on a contract for the sale of machinery, In re Saxton Furnace Co. (D. C. Pa. 1905) 142 F. 293; to allow recovery for breach of a contract of employment, In re American Range & Foundry Co. (D. C. Minn., 1927) 22 F.(2d) 558; to allow a claim arising from promises to sell a leasehold estate, In re Catts (D. C. N. Y., 1929) 33 F.(2d) 963.

In our own circuit it has been applied to claims arising out of the obligation of a building and loan association to its stockholders, Merchants' National Bank v. Continental Building & Loan Association (C. C. A. 9th Cir., 1916) 232 F. 828, and to allow proof of a claim arising from a contract to convey land, In re Beverlyridge Co., supra.

It has also been applied to allow a claim arising from an agreement to sell stock in trade, In re Griffen Manufacturing Co. (D. C. Ga., 1930) 43 F.(2d) 624; to allow a claim arising from liability of a bankrupt as an indorser upon a promissory note which had not matured at the time of the adjudication, Maynard v. Elliott (1931) 283 U. S. 273, 51 S. Ct. 390, 75 L. Ed. 1028; and to allow claims arising from moneys due on a bankrupt corporation's bonds issued under a trust indenture, In re Paramount Publix Corporation, supra. And in the leading case on the subject, Central Trust Co. v. Chicago Auditorium, Ass'n, supra, it was applied to a contract granting the baggage and livery privilege of a hotel.

This rather extended reference to the principles upon which the determination of this review depends is made necessary by the insistence of the claimant that the referee should have determined the matter in accordance with the numerous cases allowing contingent liabilities rather than in

accordance with the trustee's contention that the matter is governed by the rule disallowing such claim arising from the relationship of landlord and tenant. It is insisted upon behalf of the claimant that the instrument by which the relationship was created is a mere license to do business upon another person's premises and is not a leasehold. Arrangements of the type under consideration here have been held, for certain purposes, to be licenses. R. H. White Co. v. Jerome H. Remick & Co. (1908) 198 Mass. 41, 84 N. E. 113; Gerould Co. v. Arnold Constable & Co. (C. C. A. 1st Cir., 1933) 65 F.(2d) 444; Milwaukee Boston Store v. Katz (1913) 153 Wis. 492, 140 N. W. 1038, 1039; Baille v. United States (C. C. A. 8th Cir., 1934) 70 F.(2d) 527. The line of demarcation between leases and licenses is not always easy to draw. At times, we find courts calling an agreement a license in order to confer upon the parties to it certain rights which would not be theirs were they considered parties to a lease. At other times, courts resort to the law of landlord and tenant in order not to subject the parties to the arbitrary penalties incident to a license. 35 Cor. Jur. 954.

It is said generally that while a "license" is merely a right to do certain things upon the property of another, a "lease" confers exclusive possession to the lessee in exchange for the payment of rentals. In Shaw v. Caldwell (1911) 16 Cal. App. 1, 7, 115 P. 941, 943, it is said: "The test to determine whether an agreement for the use of real estate is a license or a lease is whether the contract gives exclusive possession of the premises against all the world, including the owner, in which case it is a lease, or whether it merely confers a privilege to occupy under the owner, in which case it is a license, and this is a question of law arising out of the construction of the instrument." And in the only California case we have been able to find which endeavors to state the nature of the relationship arising when the owner of a store contracts that another might conduct business upon a definite portion of it, the conclusion is reached that the rights acquired are more than a mere privilege; that they partake of the nature of a lease. Herman v. Rohan (1918) 37 Cal. App. 678, 174 P. 349.

By the terms of the instrument under consideration here, the bankrupt acquired the right to occupy a *definite space* in the claimant's store for a *definite period of years,* for which he paid a rental measured in terms of percentage of sales, with a minimum guaranty to the lessor. Definiteness of space to be occupied is one of the criteria for determining that an instrument is a lease. Baille v. United States, supra.

It is true that the claimant exercised certain supervisory powers, but these were powers made necessary by the nature of the relationship, and by the fact that the business conducted upon these premises by the bankrupt had to conform, in order to avoid friction, to certain common arrangements applicable to the entire store. These arrangements do not detract from the estate which the bankrupt acquired by this instrument. It is true that the location could be changed by the lessor upon thirty days' notice to the lessee. But the lessor was under obligation to provide new space containing the same square footage. And subject to this right of change, or rather substitution, of situs, the right of occupancy of the lessee was absolute against the whole world, including the lessor, so long as he paid the rent and complied with the other conditions of the instrument. Unlike the agreement which the court had under consideration in Central Trust Co. v. Chicago Auditorium Ass'n, supra—which was terminable upon six months' notice in writing by the grantor of the privilege whenever the service was not, *in its opinion,* satisfactory, or in the event of change in management—the bankrupt, under the lease under consideration here, *could not be deprived* of the interest he had acquired through the instrument except for breach of its conditions.

We think that to a relationship of this character, the words of Knappen, Circuit Judge, in Coney Island Co. v. McIntyre-Paxton Co. (C. C. A. 6th Cir., 1912) 200 F. 901, 905, apply with great apposition: "We think it a misnomer to call the agreement before us a mere license. As construed below, it was not intended to continue merely at the will of the plaintiff. It recognized an interest in defendant in the qualified use and possession of plaintiff's land. It was intended to constitute a limitation upon plaintiff's sole use and possession of its land, so far as inconsistent with defendant's qualified and concurrent right of possession, and to the ex-

tent necessary for the performance of the contract. It was not for an indefinite or permanent term, in a strict sense, but was to continue during a period whose limits were determined, although as yet uncertain in years. It pertained to the use of personal property, in whose beneficial use plaintiff was directly interested. It provided for action to be done on plaintiff's land for its benefit, not merely to be derived from its interest in the defendant, but through compensation to be paid directly to plaintiff for right to so operate. The defendant, moreover, as well as the plaintiff, was under express obligation to perform it. Such rights, we think (if effectively conveyed), amount to an interest in the land, as distinguished from a mere license." It may be conceded that the designation of an instrument as a lease by the parties to it may, of itself, be inconclusive. Its nature is to be determined from a study of its conditions as a whole.

When so studied, the instrument under consideration has all the earmarks of an instrument creating a leasehold interest. Some of its provisions have already been adverted to. To others we shall now advert, culling them from the lease in the order in which they appear therein.

The lessee must keep fully insured, at his own expense, the property in the department, including the merchandise and stock in trade, against loss by fire. He has the management of the department, subject to the provision that the department shall be carried on as an integral department of the store. He pays all taxes, assessments, and liens against the department and against merchandise, fixtures, cases, stock in trade, and all the personal property in it. He is required to comply with all the governmental regulations relating to sanitation, health, or otherwise, subject to this significant clause: "* * * and the abatement of the use of said building or the premises herein leased by reason of any breach of any of said rules or regulations by said lessee, his agents, servants or employees, shall not terminate or in any way affect the obligations of the lessee hereunder." In other words, upon the abatement of the use of the building or of the portion leased, brought on by any act of the lessee, he is not released from any of the obligations under the lease.

While the lessor agrees to receive merchandise purchased by or consigned to the lessee, the lessee is required to do his own unpacking, and the lessor, except in case of gross negligence upon the part of its servant, is not liable for any damage to any property of the lessee while it is being handled by the lessor in so receiving and delivering it. While the lessee agrees to deliver, through its usual delivery service, the goods, wares, or merchandise sold by the lessee to customers, the lessee pays the expense of such delivery. Here again the lessor is relieved of responsibility for damage to or loss of any property so delivered by it or its agents, except in case of gross negligence. The lessee must insure and bear the expense of insurance on any of its property situated on the premises. He must keep himself fully insured according to the Workmen's Compensation, Insurance and Safety Act of the State of California (St. 1917, p. 831, as amended). In addition to this, he must, at his own expense, take out and maintain public liability insurance for compensation. The lessor is released from all liability of any kind or character to any person or property caused by any use or misuse of the premises or of any structural defect or defect in the wiring, plumbing, furniture, or equipment or caused by any appliance or by water leaking, flowing, or standing upon the premises caused by the negligence of the lessor, his servants or employees. He is also released from any loss, damage, or injury to the property or person of any third party, whether he be the licensee or customer of the lessee, or from any accident or injury on the premises from any cause whatsoever other than the lessor's own negligence. He is also relieved of responsibility for any damage to or shortage of merchandise, furniture, or furnishings or any other materials belonging to the lessee in said premises.

The lessee accepts the premises in the condition at which they were at the time of the lease and obligates himself to maintain them in good order and repair and to surrender them in like good order and repair, reasonable wear and tear excepted. The lessor is not to be called upon to make any improvements upon the premises; nor may he be required to replace or repair any plumbing, furniture, or any other equipment in, on or about the premises. The sales force, the lessee agrees to maintain at his own cost and expense, and to pay their salaries. The lease cannot be assigned or transferred, nor can any part of the premises be sublet, without the written

consent of the lessor. The lessee agrees to pay for all merchandise and have the same charged to himself and "under no circumstances is any of said merchandise or other property or expenses to be charged to the lessor hereunder." In no sense is the lessee to be the agent of the lessor for any purpose, nor shall he have any authority to create any obligation or liability which shall bind the lessor, "and if any obligation or liability binding upon the lessor shall arise by reason of any act or omission of the lessee, his agents, servants, or employees, lessee will hold lessor harmless for the same." The lessee agrees to make its advertising a part of the advertising of the lessor, agrees to spend for such advertising an amount equal to at least 3 per cent. of his annual gross sales, and to pay his pro rata proportion of such advertising. The lessor is relieved of responsibility for any misrepresentation of goods by the lessee in any advertising. Notices or demands to be served by the lessor may be served by leaving a copy with the manager of the lessee on the premises. And all the terms, covenants, and conditions of the lease are made to inure to the benefit of the lessee, his executors or administrators, and any of his successors or assigns "who have become such by consent of the lessor."

As against these rights and obligations of the lessee, in addition to the payment of the rent, the lessor reserves to himself certain general supervisory rights which we enumerate in the manner (although *not in the form*) in which they are set forth in claimant's brief.

The employees of the department are under the direct supervision, and must meet with the approval, of the lessor. Any employee not meeting with such approval may be dismissed by the lessor, *after consultation with the lessee*. The employee is subject to the same regulations as the other employees of the lessor, and if any of the employees of the lessee are discharged by the lessor, the lessor is made the exclusive judge of the reason. Money received through the sale of merchandise is paid over at the time of the sale to the cashier of the claimant. But he must account for it and can only retain the amounts to which he is entitled either as the monthly rental or as the lessee's pro rata share of the expenses which he is required to share. The lessor pays the salaries of the lessee's employees, but with the lessee's money. He approves credit sales. He handles disputes with customers about returned goods. He keeps accounts and records of sales and cash received from the department. He receives goods and merchandise purchased by the bankrupt and delivers them to him; but, as already noted, is relieved from all responsibility for damage in so doing, except in case of gross negligence. He bears the expense of the receiving department and other departments—such as the adjusting department, the employment and welfare department, the hospital and rest room, and others—which perform functions for the whole store. The lessor furnishes telephone service from its private switchboard. Finally, the merchandise in the department, and letters, statements, or other similar matters are to bear, wherever possible, only the name of "B. F. Schlesinger & Sons, Inc." The merchandise is required to be of the highest type, and the sales policy to accord with the policy of the store. No misrepresentation of goods is to be made in advertisements or in any other way. The employees of the lessor are given a 10 per cent. discount, in exchange for a similar discount in other departments to the lessee's employees. The department is to be carried on as an integral department of the store of the lessor and in conjunction with the "general high policy of the lessor." The lease and the arrangement, so far as the public is concerned, is denominated "a confidential relationship."

Clearly there is no mere license. Nor is there a partnership or joint adventure here, because the lessor does not share in the loss. It is true that a joint adventure or partnership appearing, a sharing of the loss may be inferred by the court, which may even determine the manner of sharing the profits where the agreement is silent. California Civil Code, §§ 2401, subd. (4), 2412; Irvine & Muir Lumber Co. v. Holmes (1915) 26 Cal. App. 453, 147 P. 229. See San Francisco Iron & Metal Co. v. American Milling & Industrial Co. (1931) 115 Cal. App. 238, 246 247, 1 P.(2d) 1008. But the lessor has surrounded himself with such a protective armour, so far as any liability for any act of the lessee is concerned, that it would be impossible without doing violence to the instrument and making a new contract, to infer an obligation to share in any loss. The most substantial consideration which

the lessor receives under the instrument is his rental in the form of a percentage subject to a minimum guaranty to insure what, no doubt, the lessor thought was a fair rental by reference to the sales made by it during the previous year when it conducted the department itself. It is true that the lessor sought to integrate the department into its store; but such integration was only for the purpose of having it, and the business to be conducted in it, conform to its *general* policy. Such a requirement was an absolute necessity if friction between the lessor and the lessee was to be avoided. But the supervisory powers which the lessor retained were not of such a nature as to deprive the lessee of that exclusive possession of a definite portion of the premises, the situs of which could be changed by the lessor upon thirty days' notice to the lessee and upon his substituting a site equal in area, and of which he could not be deprived except for breach of the conditions—which is the characteristic of a lease. Baille v. United States, supra.

As said in United States v. Gratiot (1840) 14 Pet. 526, 538, 539, 10 L. Ed. 573: "This contract purports to be a license for smelting lead-ore; and it is objected, that this is not a lease, within the meaning of the act of congress. But this objection is not well founded. It is a contract for one year, and of course, within the time limited by the law, which gives to the president authority to lease for five years. Is it, then, a lease? The legal understanding of a lease for years is, a contract for the possession and profits of land, for a determinate period, with the recompense of rent. The contract in question is strictly within this definition. The business of smelting is a part of the operation of mining, although it may be a distinct branch from that of digging the ore; but the law ought not to be so construed as to require the whole operation to be embraced in the same contract. They are different operations, requiring different qualifications, and distinct regulations. This contract is for the possession of land. The work is to be performed at the United States' lead mines, and must, of course, be performed within the limits prescribed by law to be attached to such mines. And there is an express permission to use as much fuel as is necessary to carry on the smelting business, and to cultivate as much land as will suffice to furnish teams, etc., with provender; and there is an express reservation of the rent of six pounds of every hundred pounds of lead smelted, with special and particular stipulation for securing the same. It is not necessary that the rent should be in money. If received in kind it is rent, in contemplation of law." See, also, 35 Cor. Jur. 955; Z. C. Miles Co. v. Gordon (1894) 8 Wash. 442, 36 P. 265.

In the complex civilization in which we live, in determining the relationships created by written instruments we must bear in mind their essentials, in the light of modern requirements. Restrictions in the rights of tenancy which do not affect its fundamentals should not be interpreted as destroying the relationship. One who leases office rooms in a modern office building subjects his right of occupancy to many supervisory rules by the owner of the building. The owner furnishes many of the facilities, and even the tenant's ingress and egress to and from the building may be under the control of the lessor, as is the case in multiple story buildings having elevators. The lessor may even retain the right to object to persons having access to the building. And yet such restrictions and conditions, and others that might be adverted to, do not affect the status of such occupant as a lessee. In like manner, the status of the occupant of an apartment in a modern apartment building as a tenant is not changed by the mere fact that the apartment building owner may retain control over the common halls, corridors, and elevators, may provide the heat, light, refrigeration, and other utilities, and may even regulate the race of persons to be employed by the occupants as servants.

We conclude that the relationship created by the instrument under discussion is that of landlord and tenant. The liability of the lessee to pay the rent was contingent and uncertain within the meaning of Manhattan Properties v. Irving Trust Co., supra, and Quinn v. Jaloff, supra. The uncertainty was both in the obligation and in the amount. The claim was, therefore, not a provable claim within the meaning of subdivision (a) clause (1) of section 63 of the Bankruptcy Act (11 USCA § 103 (a) (1).

The order of the referee is affirmed.