## METROPOLE CONSTRUCTION COMPANY v. FREDERICK HARTIGAN.

### Argued June 4, 1912—Decided December 12, 1912.

1. Where a tenant entered into possession of premises under an agreement with the landlord for the use of a telephone service and a hall boy, and later the landlord dispensed with the service of both, and the tenant refused to pay rent, claiming an eviction, although continuing to occupy the premises—*Held,* that his occupancy of the premises was under the circumstances inconsistent with his claim of eviction, and that he was liable for the rent due.
2. His remedy against the landlord was for a breach of the implied covenant of quiet enjoyment.

On appeal from the Second District Court of Jersey City.

Before Justices TRENCHARD, PARKER and MINTURN.

For the plaintiff-appellee, *Charles Hershenstein.*

For the defendant-appellant, *Theodore Rurode.*

The opinion of the court was delivered by

MINTURN, J.  The suit was instituted by the plaintiff as landlord of an apartment house in Jersey City, against the defendant as tenant, to recover the agreed rent for the months of January and February, 1912.  The defendant filed a recoupment, alleging that since the 1st of January, 1912, the plaintiff had failed to furnish telephone service and hall boy service in connection therewith, whereby the defendant had been damaged.  The court found that at the time of the renting the agent of defendant represented to plaintiff "that among other improvements, telephone service would be furnished, and a boy in the lower front hall to attend the same at a switchboard.  Through this switchboard connection was made with the hall phone and with telephone in booths in each tenant's apartment.  These booths were so arranged that the tenant could have his own telephone service therein independent of the house phone.  The boy at the switchboard in the hall at the house phone answered the front door.  When the arrangements were made for leasing the apartments, these matters were talked over, and agreed to be furnished.  The telephone service and the boy at the switchboard in the hall were discontinued after January 1st, 1912."  The telephone booths and wiring were not disturbed so that each tenant could supply his own service thereafter at his own expense.  A written lease was drawn up but never executed, and the tenancy continued under the verbal agreement.  There was no proof in substantiation of the claim of recoupment, and the trial court disallowed it.  The insistence of the defendant was that the taking out of a telephone service and the hall boy worked a constructive eviction, and upon that ground he refused to pay the rent.  The trial court declined to so view the

matter and rendered judgment for the plaintiff, from which adjudication this appeal was taken.

This court has held that the fact that the tenant continued in possession of the demised premises after the commission of the alleged acts of eviction, does not preclude him from setting up the claim of a constructive eviction in answer to the landlord's demand for rent. *Morris* v. *Kettle,* 28 *Vroom* 218; *Meeker* v. *Spalsbury,* 37 *Id.* 60; *Hunter* v. *Reilly,* 14 *Id.* 480.

The situation thus presented resolves itself into the inquiry whether the act of commission of the landlord operated as a constructive eviction, so as to suspend the payment of rent.

The rule was settled in *Upton* v. *Townend,* 17 *C. B.,* 30, and has been followed by this court, "that to constitute an eviction the act of the landlord must be not a mere trespass, but something of a grave and permanent character, with the intention of depriving the tenant of the enjoyment of the demised premises." Cited in *Meeker* v. *Spalsbury,* 37 *Vroom* 64.

In *Hunter* v. *Reilly,* 14 *Vroom* 483, Mr. Justice Scudder said, speaking for this court: "The consequences of an eviction by a landlord of his tenant from the whole or a part of the demised premises is that there is a suspension of the entire rent during the continuance of the eviction, the tenancy is not thereby ended for all purposes, but the rent and all remedy for its collection are suspended."

"The rule of the common law is inflexible," says Mr. Justice Depue, in *Morris* v. *Kettle,* 28 *Vroom* 219, "for the rent which, by the terms of the demise, would accrue during the continuance of the eviction, the landlord can neither sue nor can he distrain for the rent reserved or any part of it; nor can he recover for use and occupation, although in either case the tenant has continued in possession of the remaining part of the premises demised."

The difficulty encountered by the courts in determining the question in each case submitted, has not arisen from any misconception of the rule, but solely in its application to the facts of the given case.

Thus the learned editor of the American and English Cases Annotated, in a valuable foot-note to the case of *Wade* v. *Herndl,* 127 *Wis.* 544; 7 *Am. & Eng. Ann. Cas.* 591, says: "Formerly· nothing short of actual expulsion of the tenant from the demised premises operated as an eviction." *Townsend* v. *Gilsey,* 1 *Sweeny* (*N. Y.*) 155: "But in modern times the rule has been liberalized in favor of the tenant, and now any act·of the landlord, or of anyone who acts under authority or legal right given him by the landlord, which renders the demised premises unfit for the purpose for which they were leased, or which seriously interferes with the beneficial enjoyment thereof, in consequence of which the tenant abandons the premises, constitutes an eviction by construction of law; and whenever it takes place the tenant is released from the obligation under the lease to pay rent accruing thereafter."

The payment of rent which at common law was substituted for the rendering of feudal service, was based upon the theory that the land demised was the necessary factor to produce the rent, and that when the landlord directly or indirectly deprived the tenant of the use of the land in whole or in part, the tenant's inability to reap or produce the rent from the land, formed an insuperable obstacle to its collection, and, consequently, the payment of rent was suspended until the landlord made it possible for the tenant again to produce the rent, by possessing the land under the terms of the demise. *Co. Litt.* 47; 2 *Bl. Com.* 41; 1 *Wealth Na.* 190; 3 *Found. Leg.·Lia.* 289.

The legal effect of an eviction, therefore, based entirely upon the deprivation of the beneficial use, except where it took place by reason of title paramount, or at the instance of the king, was to suspend payment of the whole rent. *Walker's Case,* 2 *Co. Rep.* 22; *Mayor of Poole* v. *Whitt,* 15 *M. & W.* 571.

It will be observed, therefore, that the term "rent" under the common law and feudal system had reference distinctively to land, and was inappropriately used when intended to indicate a return for the use of money, or for the use of personalty to which the term interest is properly applicable in the legal and economic vocabulary.

The devolution of the feudal system of tenures, and the turning of land under the demands of trade and commerce into the market as a commodity, caused a commingling and confusion of terms until the word "rent" is now applied indiscriminately to the return which an owner receives for the use of personalty, as well as for the use of real property.

But the fundamental distinction and the derivation of the term must be kept in view in any attempt to intelligently apply the decisions, under the doctrine of eviction, at common law, to modern conditions, conceding, as we must, that *cessante ratione legis cessat ipsa lex.*

Reading the language employed in the decisions in this state, which we have quoted, it will be perceived that the eviction spoken of refers entirely to the actual or constructive dispossession of the tenant from the land demised, or part of the demised premises, *eo nomine,* and not from the possession of a mere incidental fixture, which, while its absence may cause inconvenience, cannot be said to be a part of the demised premises and requisite for their beneficial enjoyment.

In *Hunter* v. *Reilly, supra,* the eviction claimed was the total deprivation of the use of a hotel. In *Meeker* v. *Spalsbury, supra,* the insistence was that the hotel demised had become useless, because of the blocking up of a street leading thereto. In *Morris* v. *Kettle, supra,* the eviction was from part of the demised land.

The language, therefore, employed by the learned jurists in these adjudications, as to the right of the tenant to withhold payment of rent, for a partial eviction, clearly refers to an actual dispossession of the tenant from the whole or part of the demised premises *eo nomine, i. e.,* to the lands demised, or to the buildings thereon, so that the tenant, although in possession of a part of the premises, is unable to enjoy them beneficially by reason of the detriment suffered to the remaining part. So manifest is this, the *ratio decidendi,* that Chief Justice Beasley, in 1868, in *Brickhead* v. *Cummins,* 4 *Vroom* 44, 56, denominated the right of removal in the tenant for a partial dispossession as "the highly questionable fiction of a constructive expulsion."

Reference is here made to the fundamental doctrine underlying the cases, for the reason that the principle is therein enunciated that a partial eviction suspends the payment of rent, and for the purpose of demonstrating that in each case, the learned justices had in mind a dispossession from the land or its appurtenances, or both, and not a mere dispossession of use of what the law classifies as a fixture in connection with the realty, and which may be capable of severance therefrom, without detriment to the beneficial enjoyment of the substantial subject of the demise.

Therefore, it is that in the leading case in England of *Upton* v. *Townend, &c.,* 17 *C. B.* 30, we find the test of an eviction laid down as "not a mere trespass, but an act of a permanent character done by the landlord in order to deprive, and which had the effect of depriving, the tenant of the use of the demised premises."

It follows, therefore, that where the act of the landlord is not of a permanent but of a temporary character, which does not result in depriving the tenant of the use of the whole or a part of the demised premises, it cannot be said to constitute an eviction. An instance of this character is presented in *Meeker* v. *Spalsbury, supra,* where the act complained of was the temporary obstruction of a passageway to the demised premises. In the case at bar no claim is made that the tenant by reason of the landlord's act was compelled to remove from the premises; nor does the recoupment allege it, or the state of the case present it as a fact found by the trial court. The only inconvenience suffered was the loss of the telephone service, which has not resulted in the tenant vacating the whole or any part of the demised premises.

The *status,* therefore, is that the tenant remains in possession, claiming the right upon the theory of self-help to withhold the entire rental of the premises as *quid pro quo* for the inconvenience suffered by the loss of the telephone service.

The cases are unanimous that such is not his legal right. To work a constructive eviction there must be an actual giving up of possession of the whole or part of the demised premises as a result of the landlord's act. Such in effect is the view ex-

pressed by Chief Justice Green in *Chambers* v. *Ross*, 1 *Dutcher* 297.

"We know of no case," says the Supreme Court of Indiana, in *Talbot* v. *English*, 156 *Ind.* 299, "sustaining the doctrine that there can be a constructive eviction without a surrender of the premises." "Any neglect," says the same high authority, "of the plaintiff to make the improvements promised did not by reason of the breach, so long as the defendant chose to occupy them, give to him any right to decline payment of the rent." *Taylor* v. *Finnigan*, 189 *Mass.* 568.

The rule is similar in New York. *Boreel* v. *Lawton*, 90 *N. Y.* 293; *Tallman* v. *Murphy*, 120 *Id.* 345.

Valuable notes containing the cases elucidating this rule will be found at the foot of the opinion in *Wade* v. *Herndl*, 7 *Am. & Eng. Ann. Cas.* 591, and in 17 *L. R. A.* 275; also 24 *Cyc.* 1059.

The inquiry, naturally, results as a corollary to this conclusion whether the tenant in possession is remediless. The answer is found in the authorities.

In *Meeker* v. *Spalsbury*, *supra*, Mr. Justice Collins, speaking for this court, says: "The remedy, if any, of the tenant for such obstruction as was authorized by the landlord, was not to cease paying rent, but to seek damages for a breach of the landlord's implied covenant of quiet enjoyment."

In *Johnson* v. *Oppenheim*, 12 *Abb.* (*N. Y.*) *Pr.* (*N. S.*) 449, the rule is laid down as follows: "Where the landlord commits an act or acts of trespass which interferes more or less with the beneficial enjoyment of the premises, but which leave the demised premises intact, and do not deprive the tenant of any part of them, so that though he may be injured, he is not thereby dispossessed, here the rule is, inasmuch as the wrongful act of the landlord stops short of depriving the tenant of any portion of the premises, that such trespass is no defence against the liability for rent, and the tenant's sole remedy therefor, is an action for damages against the wrong-doer." Citing *Edgerton* v. *Page*, 20 *N. Y.* 281. See, also, 24 *Cyc.* 1059, and cases cited.

That the defendant in the case at bar properly conceived his remedy in this regard is manifest from the fact that he filed his recoupment, but, as the trial court found, was unable to sustain it by the necessary proof of damage.

The judgment will be affirmed.