In the Matter of DABEN
CORPORATION, Debtor.

Civ. No. 78–2531.

United States District Court,
D. Puerto Rico.

March 26, 1979.

**138**

Rafael A. Rivera Cruz, Reginald J. Barney, Robert J. Griswold, San Juan, P. R., for plaintiff.

Otero Suro & Otero Suro, Hato Rey, P. R., for defendant.

## OPINION AND ORDER

TOLEDO, Chief Judge.

Debtor Daben Corporation ("Daben"), has appealed before this Court the Bankruptcy Court's Order of November 8, 1978, enti-

tled: "Order re Claims No. 41 and 126", pursuant to Rule 809 of the Rules for Bankruptcy Procedure. Daben is a merchandiser on children's wear and GEM de Puerto Rico, Inc. ("GEM") the creditor, operates several department stores in San Juan metropolitan area. On May 3, 1963, and at undetermined dates thereafter, the parties entered substantially identical agreements termed "license agreements", whereby Daben was granted a "license" to operate a children's department in space belonging to GEM at three different locations in Puerto Rico: Norte Shopping Center, San Juan; Laguna Shopping Center, Carolina; and Altamira Shopping Center, Guaynabo. The contracts for all three locations,[1] in standard printed forms, are substantially the same. José Dávila Correa & Co., apparently a predecessor company to Daben, appears as the licensee in the 1963 agreement, the only one in the record. We shall assume that Daben has been substituted therein for all effects.

On September 24, 1976, Daben filed a petition under Chapter XI of the Bankruptcy Act. On November 29, 1976, GEM filed Claim No. 41, for $43,445.60, amended on May 23, 1978, by Claim No. 126, for $123,-994.11. The latter amount included $90,-382.48 for administrative rents; this portion of the claim was separated by the Bankruptcy Judge for a separate hearing. Another $28,448.63 was claimed by GEM under Section 64(a)(5) of the Bankruptcy Act. As appellee has accepted, this amount was subject to a set-off of $14,400 (security deposited by appellant). The amount of $14,048.63 was allowed by the Bankruptcy Court in the "Order re Claims Nos. 41 and 126" and debtor was ordered to pay said amount. That is the Order that Daben is presently appealing. Daben contends: (1) the agreement between debtor and creditor, purportedly a "lease" contract was actually a license, and is thus deprived of the protection afforded by Section 64(a)(5), Title 11, United States Code, Section 104(a)(5) of the

---

1. Claims relative to the Altamira Shopping Center are not in issue herein as the agreement on those premises was rejected by debtor with the approval of the Bankruptcy Court on October 12, 1976.

Bankruptcy Act[2]; (2) even assuming that the agreement was a lease, the provisions of the Puerto Rico Civil Code invoked by appellees are not presently in force; thus there does not exist a "state law" on which priority under Section 64(a)(5) can be recognized.

The contract between Daben and GEM entitled "License Agreement", provided as follows in its preamble:

"Whereas the parties recognize that the success of GEM will be affected by Licensee's observance of such merchandising policies, standards, and practices as GEM shall formulate from time to time and that any deviation therefrom by Licensee will adversely affect the operators of all other departments in said building and expose them to the risk of damage and injury."

Licensee was to sell only the following merchandise, termed "department goods": "[i]nfants and children's wearing apparel; girls through sub-teens, boys six to twenty size range. All juvenile furniture, (preamble). The "licensee" was granted a "license"

"to operate such a (children's) department in said building during the term thereof, *in the department space assigned thereto by GEM from time to time,* and to utilize in connection therewith the reserve stock or warehouse space assigned from time to time, hereafter collectively referred to as "subject premises", subject to and upon the following covenants and conditions . . . " (emphasis supplied).

The "license" was of indefinite duration (Par. 1) and licensee was to pay no rent, but rather a "percentage license fee" fixed at 10½% of gross sales (for the department space) and $1.25 per square foot for warehouse space "assigned from time to time". (Par. 2(A), 2(B). Licensee had to pay a "concurrent fee" of $2,150 as security in each of the contracts, (Par. 2). The agreement imposed a series of obligations on licensee: (1) to include all transactions in sales books prescribed by GEM, (Par. 3); (2) to furnish GEM, at the close of the business day, a carbon copy of each sale or transaction (id.); (3) to purchase from GEM, one or more recording, receipting, and locked-in cash registers; licensee would process therewith all sales and transactions; permit GEM to inspect the registers at any time, and furnish GEM with recordings as it shall desire therefrom (id.); (4) to maintain complete records and books of account according to generally accepted accounting principles and procedures, (Par. 4); (5) to furnish GEM with computations of gross sales upon request as well as of initial and realized mark-ups by merchandise classification, operating expenses, inventories, and such other information relating to the operation of the department as GEM shall specify; (6) *not* to create a "*good will account*" in its balance sheet and *not* to attribute to fixtures, equipment or other property a greater value than loss less accumulated depreciation (id.); (7) to deliver to "licensor", at the end of each fiscal year, a profit and loss statement of operations (id.); (8) to permit inspection by GEM or accountants appointed by it at any time during the life of the agreement and until one year after its expiration (id.); (9) to equip the department store space allotted as GEM deems proper; remodeling of the department requires GEM's written consent, (Pr. 5); (10) to maintain a full, stable inventory, attractively displayed, (Par. 6); (11) to conduct sales only when and if GEM approves (id.); (12) to staff the department with adequate personnel (id.); (13) to comply with GEM's labor policies (id.); (14) to discontinue sale of any merchandise intended to be handled elsewhere in the building (id.); (15) to operate the department in full harmony with all policies and standards prescribed by GEM from time to time (id.); (16) to maintain adequate and sufficient inventory in order

---

**2.** It is unclear whether Daben claims that the "license agreement" is not a lease under Puerto Rico law *or under general common law* principles. The latter seems more likely as Daben does cite two Federal decisions.

to achieve maximum sales volume (Par. 7(a)); (17) to maintain lower prices than the competition within the particular store's trading area, by as wide a margin as possible, (Pr. 7(b)); (18) not knowingly offer for sale goods at an equal or higher price than the competition, the determination of the store's general manager being conclusive as to all matters pertaining to Paragraphs 7(a) and 7(b) (id.); (19) to sell only to persons eligible, according to GEM rules and regulations, to enter the store and effect purchases (Par. 8); (20) to use the GEM name, but Daben could not pledge the credit of GEM or incur in any liability on its behalf (Par. 13); (21) to permit quality testing of goods sold (Par. 14).

GEM was to have exclusive control over advertising, sale, and promotion of merchandise or services (Par. 16) and was authorized to directly solicit cooperative advertising allowances to be used in connection with GEM's advertising program (Par. 16). If licensee ceased operations, whether or not either of the parties had notified termination, GEM had the unilateral option of removing all furniture, fixtures, other equipment and merchandise (Par. 25). GEM could negotiate labor contracts at its discretion, with only advisory participation by licensees (Par. 29).

GEM agreed to furnish janitorial services, incoming telephone service, and standard lighting; to maintain and keep lighted a parking area; to provide the heat, air conditioning, water, and electrical services normally required (Par. 15). GEM further agreed to formulate rules and regulations as to the eligibility of persons to enter the store, as well as to advertise products and services offered in the store (Par. 15). Finally, the agreement provided that all licensee rights were personal and non-assignable (Par. 30) and specified that the parties did not intend to create a joint venture or partnership (Par. 34).

Section 64(a) of the Bankruptcy Act enumerates the debts which are entitled to priority with respect to a debtor's assets after specific lien claims have been satisfied but before dividends are paid to other creditors. The fifth priority, insofar, as is relevant herein, is

> "rent owing to a landlord who is entitled to priority by applicable State law . . . Provided, however, That such priority for rent to a landlord shall be restricted to the rent which is legally due and owing for the actual use and occupancy of the premises affected, and which accrued within three months before the date of bankruptcy." Title 11, United States Code, Section 104(a)(5).

The moneys owed by Daben to GEM for the occupancy of store space enjoy a priority status under Section 64(a)(5) only if the "percentage license fee" constitutes "rent". The present text of Section 64(a)(5) was enacted in 1938, in substantially its present form, as an amendment to the Bankruptcy Act. 52 Stat. 874 (1938). Under Section 64(a)(5) the creditor of the "rents" is the "landlord", which suggests that the amendment is solely directed at payments made under the terms of a landlord-tenant relationship. The committee report referred on several occasions to the landlord but does not expressly condition the priority on the existence of a lease agreement. H.Rep. No. 1409, 75th Cong., 1st Sess. 15–16 (1937), cited in Collier *On Bankruptcy*, 64.501(2.2) n. 6. There is no question that Congress could have included license fees among the priorities in the 1938 Amendments.[3] By

---

**3.** We can only speculate as to Congress' reasons for not including licensing arrangements among the relationships entitled to priority under Section 64(a) of the Act. The most obvious possible explanation is that licensing arrangements may be unilaterally terminated at the licensor's pleasure; a licensor had no reason to continue a license when a licensee approached insolvency, while a lessor would have to abide by the term provided in the lease contract.

Congress may have seen no need to accord preferential treatment to a licensor who allows a licensee to miss any payments and yet remain in the licensed property. Priorities under the Bankruptcy Act are exceptional creatures and strong policy considerations underlie each one. See *Collier on Bankruptcy* 64.02(1).

The Committee reports do reveal that Congress was most concerned with situations where rent claims in small estates used up all

1930, according to authoritative estimates, more than 60% of department stores and more than 48% of specialty stores already had "farmed out" departments under "department leases" (both license and straight lease arrangements; see *infra*). The average number of such departments per store in each class was about 4.6 and 2.5, respectively. Teele, *Department Leasing in Department Stores* (Harv. Bus. School Study No. 4; 20 Baker Foundation No. 7, 1933); cited in "Agreements for Leasing Departments in Retail Stores", 35 Mich.L.Rev. 95 (1936).

■ Since the Bankruptcy Act is a law of the United States, a common law jurisdiction, we must additionally inquire at this time as to the meaning of "rents" and "landlord" under common law doctrine. Federal statutes can properly be construed in light of the common law, and must generally be given their common law meaning, absent some indication to the contrary. *Isbrandten Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952); *U.S. v. Monaterski*, 567 F.2d 677 (6 Cir., 1977); *Thomas v. U.S.*, 189 F.2d 494 (6 Cir., 1951).

"The status of state law, both common and statutory, may provide valuable inroads to the discovery of the legislative purpose and mischief where the meaning of the statute is subject to reasonable doubt." Sutherland, *Statutory Construction* (3rd Ed. 1943).

■ The common law harbors several usages for the term "rent"; most broadly, it is the profit issuing yearly out of lands in return for their use. *Bearden v. Knight*, 149 Tex. 108, 228 S.W.2d 837, 843 (1921). "Rent" has also been defined as something which a tenant renders out of the profits of the land which he enjoys, and as a compensation or return in the nature of an acknowledgment or recompense given for the possession of some corporeal inheritance. *In re Perlmutter's Will*, 156 Misc. 571, 282 N.Y.S. 282 (1935). And despite its original reference to land only, "rent" has even been

extended to the return for the use of personalty as well as of real property. *Metropole Const. Co. v. Hartigan*, 83 N.J.L. 409, 85 A. 313, 314 (1912). The most common usage of "rent" is in the context of lease agreements. *Bearden*, supra. Indeed, there is authority to the effect that the existence of an agreement to pay rent ordinarily implies that there is a lease contract, *Myers v. Roberts*, 50 Or. 81, 89, 89 P. 1051 (1907), unless circumstances (most importantly the intent of the parties as expressed in the terms of the agreement) indicate otherwise. *Id.* In the context of lease agreements, "rent" is defined as the amount paid for use and occupation of land or other property. *Worcester Masonic Charity & Educational Assoc. v. Assessors of Worcester*, 326 Mass. 409, 94 N.E.2d 763, 765 (1950). See also *University Plaza Shopping Center, Inc. v. Garcia*, 279 Md. 61, 367 A.2d 957 (1977). With respect to Section 64(a)(5) of the Bankruptcy Act, reference to lease agreements is particularly compelled by the repeated references to the "landlord" in the text of the statute and in the legislative history. A landlord is virtually always a "lessor"; the only difference between the relationships of landlord-tenant and lessor-lessee is that the latter refers only to the contract, while the former relates both to the contract and to the change in possession of the premises. *Simon v. Kirkpatrick*, 141 S.C. 251, 139 S.E. 614, 54 A.L.R. 1348 (1927); *Stone v. City of Los Angeles*, 114 Cal.App. 192, 299 P. 838, 841 (1931).

■■ The nature of the agreement between Daben and GEM is crucial to a determination of whether or not payments made by Daben as "percentage license fees" are "rent" under Section 64(a)(5). Of course, as in any contract, the fact that the agreement between the parties was termed a "license agreement" rather than a "lease" is significant, but not conclusive. Corbin, *On Contracts*, Section 538 (3d Ed. 1960). The intent of the parties is the definitive element. The intent is primarily ascertained in light

the funds and left nothing over for administrative costs. H.R.Rep. No. 1409, 75th Cong. 1st Sess. (1937), cited in Kraus, "Effect of Amendment to Bankruptcy Act", 13 So.Calif.L.Rev. 245 (1940).

of the terms of the contract, construed as a whole. *Di Renzo v. Cavalier*, 165 Ohio St. 386, 135 N.E.2d 394 (1956); Corbin, supra, Section 549. A lease will exist only if the agreement contains the ingredients thereof. GEM contends that the agreement should be construed to be a lease because the intention of the parties was to execute a lease. This is evidenced, GEM further alleges, by Daben's repeated references to the agreement as a lease.[4] Yet, the Court is to recur to such additional evidence only where the language of the contract is not clear. It is black-letter law that the intention of the parties is to be gleaned, in the first instance, from the language of the contract. *Hensler v. City of Los Angeles*, 124 Cal.App.2d 71, 268 P.2d 12 (1954) and cases cited therein; cited in Williston *On Contracts*, Section 601 (3rd Ed. 1961).

▮ The "license agreement" involved herein is a "department lease". In general, this "sui generis" contract shares some characteristics of licenses and some of leases. "Agreement for Leasing Departments in Retail Stores", supra. The agreements are termed leases because most of the courts employ terms suggesting a landlord and tenant relationship, but the courts have by no means always found that to be the actual legal situation. *Id.* at 95, n. 2. Analysis of the specific content of such a "department lease" is essential. Perhaps the relationship most proximate to a lease is a license. In fact, where a court desires to classify a "department lease" but is unable to find a lease, the tendency has been to conclude that a license exists. "Agreements for Leasing Departments in Department Stores", supra, at 99–100. In this context, a "license" is a "catch-all" category for all consented occupation and use of real property which does not rise to the status of a lease and does not merit the protection thereof. The parameters of our analysis are thus leases vis a vis licenses.[5] It is often difficult to distinguish between a license and a lease. *Alexander v. Gardner*, 123 Ky. 552, 96 S.W. 818 (1906). Yet, the consequences are significantly different. A license is commonly defined as a mere permit or privilege to do what otherwise would be unlawful; it is generally revocable at the pleasure of the owner, and gives occupancy only so far as necessary to engage in the agreed acts of the performance of agreed services and no further. *American Coin-o-Meter v. Poole*, 31 Colo.App. 316, 503 P.2d 626 (1972); *Thiokol v. Morris County Board of Taxation*, 41 N.J. 405, 197 A.2d 176 (1964). It is a privilege to occupy under the owner, and only insofar as the owner expressly allows. *San Juan Gold Co. v. San Juan Ridge Mutual Water Assoc.*, 34 Cal. App.2d 159, 93 P.2d 582, 589 (1939). "A lease, on the other hand, gives the right of possession of the property leased, and exclusive use or occupation of it for all purposes not prohibited by its terms." *American Coin-o-Meter*, supra. The essential charac-

---

4. Daben referred to the "license agreement" as a "lease", and payments thereunder as "rent"; in the following instances: (1) Debtor's Application to Reject Lease dated October 1, 1976; (2) Debtor's letter to GEM dated February 17, 1977, signed by debtor's President José Dávila Valdejulli; (3) Debtor's checks No. 141, dated February 17, 1977, in the sum of $1,532.32, signed by Mr. Valdejulli; (4) Debtor's statement of rent in January, 1977. (Exhibits, Memorandum of Appellee, filed January 25, 1978).

5. We do not discuss partnerships or joint venture agreements, which are sometimes used to describe "department leases". *Milwaukee Boston Store v. Katz*, 153 Wis. 492, 520, 140 N.W. 1038, 1070 (1913), cited in "Agreements for Leasing Departments in Retail Stores", supra. The agreement herein does not set a minimum guaranteed amount of revenue to which GEM could be entitled regardless of the gross sales income obtained by Daben. Principally, GEM was to be paid only a fixed percentage of gross sales. GEM could conceivably incur in losses along with Daben during such times as the percentage of sales did not reach the reasonable value of the space leased plus services rendered. However, as "licensor" under the agreement, GEM could terminate the contract any time and was not in any way compelled to share Daben's losses on a continuing basis. Furthermore, the agreement does not expressly provide that the parties would share profits and losses. Indeed, the parties expressly agreed not to establish a joint venture or partnership and that nothing in the contract was to be so construed. (Par. 34).

teristics [6], of a lease contract in the common law are as follows: (1) a conveyance of a right of exclusive possession, *Bentley v. Palmer House Co.*, 332 F.2d 107 (7 Cir., 1964); *Bodden v. Carbonell*, 354 So.2d 927 (Fla.App., 1978); *Gage v. City of Topeka*, 205 Kan. 143, 468 P.2d 232 (1970); *Wash-o-Matic Laundry Corp. v. 621 Lefferts Ave. Corp.*, 191 Misc. 884, 82 N.Y.S.2d 572 (1948); *Restatement 2d of Property-Landlord and Tenant*, Sec. 1.2 (1977); (2) effective as to a specifically described location, *In re Owl Drug Co.*, 12 F.Supp. 439, 442 (D.C.Nev., 1935); *Bodden, supra; American Coin-o-Meter, supra; Restatement 2d, supra,* Section 1.1.

■ "Possession" has a variety of meanings in the common law, depending on the context of the writing and on the circumstances. *Pemberton v. Hardin*, 258 Ky. 538, 80 S.W.2d 589 (1935). It has been described as a "chameleon-like" term, *Baehr v. Penn-Tex Oil Corp.*, 258 Minn. 533, 104 N.W.2d 661 (1960), and as the most ambiguous legal term in its usage, either as to real property or personal property. *Gibbs v. Corbett*, 292 S.W. 260 (Tex.Civ.App., 1927). In the context of leases of real property, possession is the relationship between a person and real property which gives that person control over and the power to exclude others from the property. *Restatement 2d, supra,* Section 1.2. "Exclusive possession" a term most pointedly used where adverse possession is alleged, merely means the actual exercise of the possessory rights vis a vis third parties. *Point Mountain Coal & Lumber Co. v. Holly Lumber Co.*, 71 W.Va. 21, 75 S.E. 197 (1912); *Bass v. Pease*, 79 Ill. App. 308. Its proper connotation in the circumstances of this action is as a right of possession (somewhat redundantly) expressed in relation to one and only one person, purportedly Daben.

■ "Control", one of the two definitory elements of "possession" has also been variously defined, in keeping with popular usage (the term has no distinct legal meaning), *Gulf Refining Corp. v. Fox*, 11 F.Supp. 425 (S.D.W.Va., 1935). Where possession is in issue, "control" signifies physical power. *Crist v. Potomac Insurance Co.*, 243 Or. 254, 413 P.2d 407, 410 (1966). The degree of supervision or direction exercised over the activities ordinarily carried out within the property (a primary concern where the controversy involves an agency relationship or the application of *res ipsa loquitur*) is also relevant. *Feinman v. A. H. Bull S.S. Co.*, 107 F.Supp. 153, 155 (D.C.Pa., 1952); *Connie's Construction Corp. v. Fireman's Fund Insurance Co.*, 227 N.W.2d 207 (Iowa, 1975); *First National Bank of Arizona v. Otis Elevator Corp.*, 2 Ariz.App. 80, 406 P.2d 430 (1965). Standing alone, without qualification, "control" necessarily means not partial but complete control. *Ligon v. Redding*, 300 Ky. 329, 188 S.W.2d 483 (1945). This is particularly so when "exclusive possession" must be established.

■ The power over access is not conclusively resolved by the existence of a "lessor's" [7] power of entry, nor is exclusive possession thereby ruled out. *In re Owl Drug, supra.* However, if the owner has the right to limit access and enjoys a general right of entry for supervising purposes, control and hence possession inure to the "lessor", *Milwaukee Boston Store, supra;* "Agreements for Leasing Departments in Retail Stores", *supra,* at 99.

■ The agreement between Daben and GEM plainly confers on the latter the physical control of the department space. Daben had to admit all persons allowed by GEM to enter store premises, and could invite only those who qualified to enter the

**6.** The amount of rent payment does not have to be numerically established; as in the agreement between the parties herein, it can be leased on a percentage of gross sales. *Restatement 2d, supra,* Section 12.1. The term of the agreement may be indefinite, subject to termination by either or both parties (tenancy at will). *Id.* at Section 1.6.

**7.** Wherever the terms lessor, lessee or lease appear in apostrophes, we mean to imply that the relationship is not being prejudged initially, and may turn out to be either a license or a lease.

store under GEM access rules. Daben could operate the department only at the times selected by GEM as store working hours. At all times, GEM had access to the department to inspect Daben's cash registers and books of account. And GEM also comprehensively regulated the activities within the department. Daben could sell only the type of merchandise described in the "license agreement", at prices below those of the area competition. The department had to be equipped as GEM deemed proper, and merchandising was subject to GEM approval. Daben sales had to be recorded in cash registers purchased from GEM; every day, Daben had to provide GEM with copies of the sales receipts. Daben had to use the GEM name in dealing with retail customers, and no other. Daben's labor policy was established by GEM. And the warehouse space could be used only in connection with the department's operations, implying that only merchandise destined for sale in the department could be stored therein. In general, Daben had to operate the department "in full harmony with all policies and standards prescribed by GEM." It is at least clear that Daben did not have full direction over its space, no power over access and thus no "control" over the real property. This precludes a finding of "exclusive possession" in favor of Daben.

A conveyance of a definite space is also essential, in the common law, in order that a lease may be deemed to exist. *Restatement 2d*, supra, Section 1.1. Both the extension and the location of the space within the "lessor's" premises must be specified; such definiteness is one of the crucial elements distinguishing a lease from a license. *Tips et al. v. U.S.*, 70 F.2d 525 (5th Cir., 1934) (lease of 3,101 sq. ft. of space at an unspecified location in a certain warehouse); *In re Owl Drug*, supra, (rent of definite space for department at store, held a lease); *Bodden*, supra, (coin-operated laundry company occupying a particularly described area, held a lease); *American Coin-o-Meter*, supra, (coin-operated laundry company with rights solely to operate the machines and to enter the building for installation and maintenance, with no definite

space assigned, held a license); *Wash-o-Matic Laundry Corp.*, supra, (*id.*; "lease" only specified "certain laundry space" in basement of building owned by defendant held a license; the court held: "It may not be said that by virtue of this agreement the owner of the building could not require the plaintiff to move the machines to another part of the basement"); *Hess v. Roberts*, 124 App.Div. 328, 108 N.Y.S. 894 (1908) (exclusivity of providing stenographer's services at a hotel, held a license). See also: *Herman v. Rohan*, 37 Cal.App. 678, 174 P. 349; *Criterion Concessions v. Jelin Productions*, 61 N.Y.S.2d 239 (1946). Where the law of landlord and tenant has been applied to "leases" of space in department stores, the space has been particularized as to extension and location. *Meers v. Munsch-Protzmann Co.*, 217 App.Div. 541, 217 N.Y.S. 256 (1926).

The "license agreement" herein does not specify what space would be occupied by Daben in the store and in the warehouse. The agreement merely provided that GEM granted to Daben the right to operate

"in the department space assigned thereto by GEM from time to time and to utilize in connection therewith the reserve stock and warehouse space assigned from time to time."

No definite space, in terms of either area (size) or location, was specified. The Bankruptcy Court held that no such description was required, on the authority of *General American Life Insurance Co. v. North American Mfg. Co.*, 320 Ill.App. 488, 51 N.E.2d 619 (1943). In *General American,* the court found that a lease is created wherever it is agreed that one party shall divest itself of possession and the other party shall come into it for a determinate time and a fixed rental. Yet, dispensing with the requirement of definite space is contrary to the prevailing doctrine, including the *Restatement 2d of Property* and the cases cited hereinabove. *Great American's* persuasive value is further diminished by virtue of the fact that the text of the opinion is not available for study; only the syllabi was released for publication. See:

*Burbank v. Ernst*, 232 U.S. 162, 34 S.Ct. 299, 58 L.Ed. 551 (1913); *Baltimore and Ohio R. Co. v. Baillie*, 112 Ohio St. 567, 148 N.E. 233 (1925). In the absence of a conveyance of a right of exclusive possession over a definite area, and since the language of the "license agreement" is clearly that of a license, we find that said agreement is not a lease. No rent is owed by Daben to GEM, and whatever payments Daben in fact owes cannot enjoy priority status under Section 64(a)(5).

■ GEM faces an additional hurdle. Section 64(a)(5) acknowledges priority status only where the landlord-creditor is entitled to priority under state law. We must determine whether payments owed under the "license agreement" herein are entitled to such priority under Puerto Rico law. Civil Code, Art. 1822, Title 31, Laws of Puerto Rico Annotated, Section 5192. Yet, a preliminary issue must first be settled. Appellant contends that the preferences established in Art. 1822 are not in effect as it is part of the bankruptcy provisions of the Civil Code, Arts. 1811–29, Title 31, Laws of Puerto Rico Annotated, Sections 5171–5214, which were tacitly abrogated by the Bankruptcy Act. The Act entered in force in Puerto Rico in 1900 pursuant to Arts. 34 and 41 of the Organic Act, 31 Stat. 77 (1900). Daben cites in its support *Ex parte Coll*, 11 P.R.R. 49 (1906) and *Heirs of Garriga v. O'Meara & Co.*, 28 P.R.R. 332 (1920). Arts. 1811–29 have remained identical to the original provisions of the Spanish Civil Code of 1899, extended verbatim to Puerto Rico and Cuba. The drafters of the Spanish Civil Code primarily intended to establish the substantive law of three types of insolvency or near-insolvency, with respect to personal debtors[8]: (1) the "quita", or partial relief from debts, Art. 1812, Title 31, Laws of Puerto Rico Annotated, Section 5172; (2) the "espera", a moratorium on payments, *id.*; (3) the "concurso de acreedores", an arrangement of creditors in part or in full, Art. 1813, Title 31, Laws of Puerto Rico Annotated, Section 5173, very similar to certain provisions in the Bankruptcy Act. Priorities for payment of creditors in a "concurso de acreedores" were set forth in Arts. 1821–5, Title 31, Laws of Puerto Rico Annotated, Sections 5191–5. Appellee Daben invokes priorities under Art. 1822. Nowhere in Arts. 1821–5 is there any indication that said priorities were to apply to proceedings other than the "concurso de acreedores". See: Manresa, *Comentarios al Código Civil Español* 737 (1951). Yet, nowhere else in the Code are credit preferences established for noninsolvency proceedings, principally where two creditors claim priority to attach a noninsolvent debtor's property. See: *Trueba v. Zalduondo*, 34 P.R.R. 713 (1925). The Puerto Rico Supreme Court has repeatedly held that Arts. 1821–5 set forth principles of general applicability[9] which are immune to preemption by the Bankruptcy Act. *Camara de Comerciantes Mayoristas v. Tribunal Superior*, 102 D.P.R. 646 (1974); *Puerto Rico Bedding Mfg. Co. v. Herger*, 91 P.R.R. 503 (1964); *Mendez v. Chavier*, 39 P.R.R. 661 (1929); *Trueba*, supra; *Hernandez v. District Court*, 34 P.R.R. 652 (1925); see *In re Jack's Club*, 138 F.Supp. 620 (D.P.R., 1956). There is no conflict with the principle that other provisions relative to insolvency but without broader application cannot coexist with the Bankruptcy Act and are, indeed, entirely without effect. *Highland Realty Corp. v. Tribunal Superior*, 103

---

**8.** Business bankruptcies were regulated by Arts. 852–9 of the Code of Commerce while the Civil Code regulated personal bankruptcies and served to fill out any gaps in the provisions of the Code of Commerce. Arts. 852–9 have been left without effect. See: 10 L.P.R.A. App.

**9.** The Spanish Civil Code of 1889, could hardly have left creditor priorities in such other proceedings entirely unregulated. A line of decisions by the Supreme Court of Spain had already established that the preferences set forth in the Siete Partidas (Spain's principal corpus of private law before the Civil Code) for insolvent debtors applied against insolvent creditors as well. Judgments of the Supreme Court of Spain, July 3, 1876; March 30, 1883; January 5, 1884. Accordingly, a few years after enactment of the Code, the Supreme Court of Spain held that Arts. 1811–29 did apply to such claims. Judgments of the Supreme Court of Spain, November 23, 1895. Subsequent decisions have reaffirmed this holding. Judgments of April 27, 1918; November 11, 1930.

**146**

D.P.R. 306, 309 (1975); *Ex parte Coll*, supra. And Arts. 1821–5 apply to bankruptcies only insofar as allowed by the Bankruptcy Act.

■ The more imposing issue, however, is whether the "license agreement" herein qualifies as a lease agreement under Puerto Rico law. The relevant article of the Puerto Rico Civil Code provides:

"With regard to specified personal property of debtor, the following are preferred:

. . . . .

(7) Credits for rents and leases for one year with regard to the personal property of the lessee existing on the estate leased and on the fruits thereof." Civil Code, Art. 1822, 31 L.P.R.A. 5192.

This provision, by its terms, applies only to leases; however, not necessarily to a lease as known in the common law, but to leases under Puerto Rico civil law. See Gullón, *La Prelación de Creditos en el Código Civil*, 64 (1962). In construing provisions of the Puerto Rico Civil Code, we must follow the practice of the Supreme Court of Puerto Rico of referring to general civil law principles and doctrines wherever Puerto Rico law is not clear. See: *Gierbolini v. Employers' Fire Insurance Co.*, 104 D.P.R. 853 (1976). Situating the license agreement within the civil law presents interesting and seemingly intractable problems. "Department leases" developed in the United States mostly since the second decade of this century. "Agreements for Leasing Departments in Department Stores", supra. The provisions relative to concurrence and preferences of credits, however, are identical to the Spanish Civil Code of 1889. The Puerto Rico Supreme Court confronted a similar doctrine in attempting to analyze the credit card in light of civil law principles.

"Forcing new institutions or even merely new usages of familiar institutions into ancient frameworks is a task, nevertheless, that is never free of dangers. Not everything is found nor should be found

in the desired degree of detail in the Code, which sometimes derives its vitality and capacity to adapt to changing realities more by reason of its great silences and general formulations than by its detailed principles." *Santiago v. Sears Roebuck*, 102 D.P.R. 515 (1974) (our translation).

Furthermore, the lease-license distinction so useful in discussing the lease agreement in the common law context is entirely inapplicable in the civil law. Compare *Gierbolini v. Employer's Fire Insurance Co.*, 104 D.P.R. 853 (1976). Although lease contracts are regulated in a manner roughly similar to that in the civil law, Arts. 1432–1495, Title 31, Laws of Puerto Rico Annotated, Sections 4011–4143, there exists no relationship therein comparable to a license. A "licencia" in Spanish and Puerto Rico law has a nontechnical meaning close to the common law definition: a general permission to do something, Rivera, *Diccionario de Términos Jurídicos*; see Roble, *Dictionary of Legal Terms*; a permit or authorization, *Diccionario de Derecho Usual*. In its juridical usage, a "licencia" is an indispensable requirement, originating from persons or authorities qualified thereto, for executing certain rights or realizing certain actions in civil life. 21 *Enciclopedia Jurídica Española* 435 (1910). The most common legal uses are as paternal or maternal licenses [10], *Diccionario de Derecho Privado*, supra, "licenses to use patents", Morales Lebrón, *Diccionario Jurídico según la Jurisprudencia del Tribunal Supremo*, and as an administrative authorization for any number of personal or commercial activities. Capitant, *Vocabulario Jurídico*. Granting a "licencia" in the civil law does not spawn a relationship with definite rights and obligations as to real property as established in the common law. Nowhere does the Civil Code regulate the "licencia" or even employ the term. Inquiry into two closely related terms, "franquicia" (franchise) and "concesión" (concession) also sheds little light. A civil law

---

10. Permission that a wife or a minor had to obtain from husband or parents, respectively, to execute certain juridical acts.

franchise is a tax exemption granted a person, corporation, or locality. 12 *Enciclopedia Jurídica Española* 590 (1950). "Concesión" means authorization only in the realm of constitutional and administrative law, usually with respect to the exploitation of state-owned resources. 7 *Enciclopedia Jurídica Española* 853. The term has no application between private parties.

█ The Puerto Rico Supreme Court (Snyder, C. J.) encountered an agreement similar to the "license agreement" herein, but left the matter *quaere*. *Talbert v. Hilton Hotels*, 78 P.R.R. 271, 283 (1955). Talbert was an action by a clothing store operator against the hotel where the store was located, to enjoin unilateral termination of the contract by Hilton, and for damages. The relationship between the parties was grounded in a "concession contract". The contract was different from the "license agreement" in that a definite space was specified in the contract, as well as a fixed sum as rent (or a percentage of gross sales, whichever was higher) rendering the situation more ambiguous than that in the action herein. In other respects, the "concession contract" was very similar to the "license agreement". Plaintiff had to operate the shop in conformity with Hilton standards; Hilton could inspect the shop, its services and its books and records from time to time; the shop's employees had to be acceptable to hotel management, inter alia. *Talbert*, supra, at 274–5. Plaintiff invoked the protection of the Puerto Rico Reasonable Rents Act, Title 17, Laws of Puerto Rico Annotated, Sections 181 et seq., which only covers leases. Whether or not the "concession agreement" was a lease could have been the crucial issue. The Supreme Court,

however, resolved under Section 4 of the Reasonable Rents Act, Title 17, Laws of Puerto Rico Annotated, Section 184, which exempts hotel owners from coverage by the Act. The Supreme Court's additional reasons for not classifying the "concession agreement" are instructive:

"This is an issue of first impression in this jurisdiction. It involves a fairly close question which, as a general proposition, may conceivably call for a different answer in the civil law as against the common law. Cases and textbooks indicate that in the common law the line of demarcation between a lease and a license may become very shadowy. What is more important is that characterizing the concession contract herein as either a 'lease' or a 'license' may have far-reaching implications in other fields such as tax tort, and bankruptcy law. Under these circumstances, we prefer to leave open the question of whether the arrangement between Hilton and Talbert, as a matter of general law, constituted a lease in view of the result we reach in Part II of this opinion under the specific terms of the Reasonable Rents Act." *Talbert*, supra, at 282–3.[11]

█ Without attempting to grapple with the issue [12] that the Puerto Rico Supreme Court held deserving of much closer consideration, we turn to the limited inquiry of ascertaining whether the "license agreement" herein is indeed a lease under Puerto Rico law. Under Puerto Rico law, a lease may be of things, works, or services. Civil Code, Art. 1432, Title 31, Laws of Puerto Rico Annotated, Section 4011.

"In a lease of things, one of the parties thereto binds himself to give to the other

11. Chief Justice Snyder does appear to consider that the common-law license has a counterpart in the civil law. If the agreement between Daben and GEM is not a lease, it may be some other type of contract sanctioned by the Civil Code or an entirely new, sui generis arrangement. Sui generis agreements (or atypical or innominate contracts, as they are commonly termed in the civil law) may freely be created under Puerto Rico law. See *Santiago*, supra. This is a corollary of freedom of contract, a cornerstone of both the Spanish and

Puerto Rican Codes. See: *Castle Enterprises, Inc. v. Registrar*, 87 P.R.R. 738 (1963); *Clausells v. Commercial Assurance Co.*, 37 P.R.R. 110 (1927); *Castan*, supra, at p. 14. The parties' intention is the primary law between them. Civil Code, Arts. 1044 and 1207, Title 31, Laws of Puerto Rico Annotated, Sections 2294, 3372.

12. I. e. the precise nature of agreements such as the "license agreement" herein in the context of Puerto Rico law.

148

the enjoyment or use of a thing for a specified time and a fixed price." Civil Code, Art. 1433, 31 L.P.R.A. 4012.

Three essential elements thus characterize the lease contract in Puerto Rico and in Spanish civil law: (1) the thing; (2) temporal duration; (3) a price.

 All things (movable or immovable, present or future, corporeal or incorporeal) whose use or enjoyment is in commerce may be leased, even if the things themselves may not be sold or donated. *Castan*, 4 *Código Civil* 271 (1969); Manresa, 10 *Código Civil Español* 470 (1951). Only things that are consumed in their use (fungibles), Civil Code, Art. 1435, Title 31, Laws of Puerto Rico Annotated, Section 4014, and intransmissible (most personal) rights, e. g. use and habitation, Civil Code, Art. 451, Title 31, Laws of Puerto Rico Annotated, Section 1591, cannot be leased. Unlike the common law, the civil law allows that a leased thing not be entirely defined. See *Castán*, supra, at 272. GEM leased not a piece of real property, but the right to sell merchandise for profit in one of its departments. We see no reason to conclude that the lease of such a right is inadmissible in the civil law.

 Art. 1433 of the Civil Code, Title 31, Laws of Puerto Rico Annotated, Section 4012, provides that the lease agreement must set forth a specified duration. *Castán*, supra, at 258. This only means that a lease is temporal, not perpetual. A condition may be set, rather than a period of time. Manresa, supra, at 475. Similarly, where the duration of the lease is at the discretion of either the lessor or lessee, a lease does exist. *Castán*, supra, at 258, although this is a modern doctrine which modifies the textual meaning of Art. 1433 as well as of Art. 1208, Title 31, Laws of Puerto Rico Annotated, Section 3373.[13] The "license agreement" provided that it would continue in effect "for as long as it shall be mutually acceptable to the parties hereto" (preamble). Duration was sufficiently determined.

 The third essential characteristic is a fixed price. Civil Code, Art. 1433, Title 31, Laws of Puerto Rico Annotated, Section 4012; *People v. Registrar*, 22 P.R.R. 746 (1915); *Belaval v. Fajardo Sugar Growers Assoc.*, 17 P.R.R. 268 (1911); Puig Peña, 4 *Compendio de Derecho Civil* 51 (1976); *Castán*, supra, at 291; Judgments of the Supreme Court of Spain, July 8, 1914; March 5, 1924. The price does not have to be paid in money and may be paid in goods produced in the tenancy. *Castán*, supra, at 274. Nor does it have to be numerically determined at the inception of the agreement. *Id.*; see *Finlay v. Finlay Brothers*, 8 P.R.R. 371 (1905). The rules for determination of price in purchase and sales agreements are applicable to leases. Civil Code, Arts. 1336–8, Title 31, Laws of Puerto Rico Annotated, Sections 3743–5; Judgments of the Supreme Court of Spain, June 17, 1904; February 25, 1955. However, the price must *not* be in function of the income derived from use of the property. *Id.*; *Castán*, supra, at 291. Where it is, the relationship is quite likely an "aparcería", an arrangement entirely distinct from leases.[14] *Id.*; Puig Bustau, *Fundamentos del Derecho Civil*, I, II, 265 (1956).

---

13. "The validity and fulfillment of contracts cannot be left to the will of one of the contracting parties."

14. The "aparcería" is a contract whereby one person obliges itself to cede to another the enjoyment of certain things or certain elements in an estate in exchange for a percentage rate of the products or income obtained by the grantee. Puig Peña, supra, at 253; Manresa, supra, at 690. The Puerto Rico Civil Code's treatment of "aparcerías" is perfunctory. "Aparcerías", translated (inaccurately, albeit understandably) as "leases for partnerships" in the English version of the Code, are regulated in the Code only by Art. 1469, 31 L.P.R.A. Sec. 4085:

"Leases for partnerships of arable lands, breeding cattle, and for industrial or manufacturing establishments shall be governed by the provisions relating to articles of co-partnerships and by the agreements of the contracting parties."

The Spanish commentators agree that an "aparcería" is distinct from a partnership and should not be regulated as such. Puig Peña, supra, at 258–9; Manresa, supra, at 691–5;

The agreement between Daben and GEM is clearly not a lease under Puerto Rico law. The children's department and the warehouse space could validly be a lease even though the space to be occupied is not definite; and the duration of the agreement was validly determined. But at least with respect to the children's department, there is no price that would be valid under a lease contract; payments under the agreement are set at a percentage of gross sales. Leaving aside our objections under Section 64(a)(5) of the Bankruptcy Act, GEM could claim priority, if at all, only for payments due for the warehouse space, where a rate (per square foot) is specified. Yet, we question whether a price could be deemed to exist when the total amount of warehouse space to be occupied by Daben is not set forth (as it would vary from time to time), and thus a total "price" for the warehouse is not ascertainable. The "license agreement", under Puerto Rico, approaches an "aparcería", if anything; but the issue would need much closer scrutiny than is called for herein. For our purposes, it is irrelevant whether the "license agreement" is an "aparcería" or an innominate contract. The problems inherent in characterizing the "license agreement" within Puerto Rico law exemplify the manifold difficulties that arise when relationships conceived within one legal system are transposed unto another. See *Fornaris v. Ridge Tool Co.*, 400 U.S. 41, 42, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970).

In sum, we do not consider that GEM is entitled to priority status under Section 64(a)(5) of the Bankruptcy Act, as the parties thereto were not in a landlord-tenant relationship and payments under the agreement were not rent. In addition, under Puerto Rico law the "license agreement" is not a lease and thus GEM is not entitled to priority under Article 1822 of the Civil Code, Title 31, Laws of Puerto Rico Annotated, Section 5192. There is no need to proceed to oral argument.[15]

In view of the preceding, the Bankruptcy Judge's "Order re Claims No. 41 and 126" is hereby reversed. This action is remanded to the Bankruptcy Court for further proceedings in accordance with this Opinion.

IT IS SO ORDERED.

---

Costán, supra, at 584–6. In Puerto Rico, the "aparcería" is further regulated by special legislation, 5 L.P.R.A. 201–17, but only as to agricultural holdings ("aparcería" was translated therein as "share cropping contracts"). See *Charneco v. Mendez*, 65 P.R.R. 500 (1946); *Fraticelli v. Gutierrez*, 64 P.R.R. 210 (1944). Puig Peña has described the "aparcería" in general as a "seismic zone" of the law, "impossible to systematize". There is no agreement among the commentators on the nature of the contract, particularly on whether it should be treated more nearly as leases or as partnerships. The majority of the commentators, however, agree that it is a distinct relationship. In the common law, as seen hereinabove, agreements similar to that in the instant action are also in a penumbra bounded by partnerships and leases (with the license relationship adding an important ingredient).

**15.** Appellant has requested oral argument under Rule 809 of the Rules for Bankruptcy Procedure. Appellee did not request oral argument and moved only for the dismissal of the appeal, in general terms. It is appropriate to indicate that the Court is not required to grant oral argument in appeals under R. 809. *In the Matter of Bowen Transports*, 551 F.2d 171 (7th Cir., 1977); 13 *Collier on Bankruptcy*, Section 809.03.